1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
9                       CENTRAL DISTRICT OF CALIFORNIA
10
11   IRENE WILSON,                    )   NO. EDCV 03-00427-MAN
                                      )
12              Plaintiff,            )
        v.                            )   MEMORANDUM OPINION AND ORDER
13                                    )
                                      )
14   JO ANNE B. BARNHART,             )
     Commissioner of the             )
15   Social Security Administration, )
                                      )
16              Defendant.            )
     _____)
17

18       Plaintiff filed a Complaint on April 17, 2003, seeking review of
19   the of the denial by the Social Security Commissioner ("Commissioner")
20   of Plaintiff's claim for supplemental security income benefits ("SSI").
21   On June 3, 2003, the parties filed a "Consent to Proceed Before a United
22   States Magistrate Judge," pursuant to 28 U.S.C. § 636(c).  The parties
23   filed a Joint Stipulation on March 9, 2004, in which Plaintiff moves for
24   summary judgment to reverse the ALJ's decision denying benefits or to
25   remand the case to the ALJ, and Defendant opposes Plaintiff's motion and
26   moves for summary judgment to affirm the ALJ's decision.  The Court has
27   taken the parties' Joint Stipulation under submission without oral
28   argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

Plaintiff filed her application for SSI on February 20, 2001. (Administrative Record ("A.R.") 114-16.) Plaintiff claimed to have been disabled since April 1, 1985, due to hypertension, chest pain and palpitations, and depression. (A.R. 13, 114.) At the administrative hearing level, Plaintiff amended her claim for a period of disability from February 1, 2001, to February 2, 2002. (A.R. 12, 18.) Plaintiff has past relevant experience as a telemarketer. (A.R. 13, 163.)

The Commissioner denied Plaintiff's claim for benefits initially and upon reconsideration. On June 20, 2002, and September 9, 2002, Plaintiff, who was represented by counsel, appeared and testified at a hearing before Administrative Law Judge John Belcher ("ALJ"). (A.R. 25-69.) On September 23, 2002, the ALJ denied Plaintiff's request for benefits, and the Appeals Council subsequently affirmed the ALJ's decision. (A.R. 4-5, 12-21.)

## BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

**A.    Plaintiff's Medical Evidence**

In support of her claimed impairments, Plaintiff submitted the records from her treating physicians and several examining physicians. Records from her treating physicians at the San Bernardino Arrowhead Regional Medical Center and the Westside Family Health Center covered the period from October 1984, to March 2002. (A.R. 165-73, 247-90.) These records pertain to Plaintiff's general health care during this

time period, and reflect that Plaintiff had heart palpitations, hypertension, and eye problems. (*See, e.g.,* A.R. 171, 256, 261, 264, 267, 270.) Plaintiff was prescribed nitroglycerin for her heart problems and Procardia for her hypertension. (*Id.*)

In an April 6, 2001 internal medicine evaluation, Dr. Michael Chan, an internal medicine physician who examined Plaintiff at the request of the Commissioner, diagnosed Plaintiff with hypertension, which had been treated with Procardia and Tenormin. (A.R. 174-78.) He also diagnosed her with "chest pain," and further observed that she should be tested for possible angina and coronary artery disease with an electrocardiogram and treadmill test. (A.R. 177.) Dr. Chan declined to assess Plaintiff's physical limitations until such tests were performed. (*Id.*)

In an April 30, 2001 Physical Residual Functional Capacity Assessment, Dr. Norman Cooley, a state agency physician, found that Plaintiff: had a primary diagnosis of high blood pressure and a secondary diagnosis of angina;, had the residual functional capacity to perform "light" work; and could stand, sit, and/or walk for about six hours in an eight-hour workday.[1] (A.R. 211-18.)

An April 6, 2001 visual acuity test from the Alto Medical Group shows that Plaintiff had 20/50 vision in both eyes without glasses, 20/50 vision in her right eye without glasses, 20/70 vision in her left

---

[1]    "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 416.967(b), 404.1567(b).

eye without glasses, and 20/30 vision in both eyes with glasses.  (A.R. 182.)

With respect to her claimed mental impairments, Plaintiff submitted records from her treating physicians at the County of San Bernardino Department of Behavioral Health for the period from July 2001, to June 2002.  (A.R. 291-314.)  In an August 8, 2001 psychiatric assessment, Dr. Ken Galen, Plaintiff's treating doctor, diagnosed Plaintiff with "[rule out] Dysthmia, Major Depression, Depressive and anxiety symptoms secondary to alcohol dependence, Anxiety Disorder, [not otherwise specified], alcohol dependence, and [a history of] cocaine and marijuana abuse."[2]  (A.R. 306.)  Dr. Galen also noted that he "strongly suggested to [Plaintiff] that she enroll in an alcohol treatment program," and referred her for psychotherapy.  (Id.)  Dr. Galen's treatment notes indicate that Plaintiff was taking Celexa and Trazadone for her mental health problems.  (See A.R. 295.)  Almost a year later, on June 27, 2002, Dr. Galen wrote a letter to the Commissioner, stating:  "[a]t the time of [Plaintiff's] initial psychiatric evaluation, [she] presented with symptoms of [m]ajor [d]epression.  In my opinion, her symptoms of depression were not secondary to her alcohol use as she continued to be depressed after she stopped drinking.  Her symptoms of depression improved after she began taking antidepressant medication." (A.R. 314.)

_____

[2]      A dysthmic depression is a "variant of depression [that] often begins early in life and is associated with distinct changes in personality.  People with this condition are gloomy, pessimistic, humorless, or incapable of having fun; passive and lethargic; introverted; skeptical, hypercritical, or constantly complaining; and self-critical and full of self-reproach.  They are preoccupied with inadequacy, failure and negative events, sometimes to the point of morbid enjoyment of their own failures."  Merck Manual of Medical Information, 405 (1997).

4

In addition to treating records pertaining to Plaintiff's claimed mental impairment, the record contains reports from examining and non-examining medical consultants. In an April 17, 2001 report, Dr. Nick Andonov, a psychiatrist who examined Plaintiff at the request of the Commissioner, diagnosed Plaintiff with: adjustment disorder with anxiety and depressed mood; borderline intelligence with a full scale I.Q. of 75; and psychosocial and environment problems. (A.R. 185-87.) Dr. Andronov assessed her with a Global Assessment of Functioning ("GAF") of 52.[3] (A.R. 187.) He noted that "further testing will be necessary to state [a] diagnosis of [m]ajor depression or anxiety disorder. This condition is based on numerous factors including a variety of physical complaints regarding her health." (A.R. 186-87.)

In a July 26, 2001 Psychiatric Review Technique form, Dr. Michael Skopec, a state agency physician, noted that Plaintiff suffered from affective disorders and mental retardation, and that Plaintiff had "mild" and "moderate" functional mental limitations in work-like situations, but would not have episodes of decompensation. (A.R. 192-205.) In a May 10, 2001 Mental Residual Functional Capacity Assessment, Dr. Ernest Gerald, another state agency physician, found that Plaintiff was "not significantly limited" or "moderately" limited in all areas of mental functioning. (A.R. 206-09.)

---

[3]     A GAF of 51 to 60 involves "moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflict with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994) ("DSM-IV").

**B.    The ALJ's Decision**

At the June 20, 2002 hearing, the ALJ sought testimony from Plaintiff, as well as from Dr. Linda Iger, a non-examining medical expert and psychologist.  (A.R. 26-52.)  At the September 9, 2002 hearing, the ALJ again sought testimony from Plaintiff and Dr. Iger, as well as Dr. Sami Nafoosi, a non-examining medical expert and internal medicine physician.  (A.R. 53-69.)  Dr. Nafoosi testified that Plaintiff had the residual functional capacity to perform "medium" work with no other restrictions.[4]   (A.R. 58.)   Dr. Iger testified that, but for Plaintiff's alcohol abuse, her underlying depression would not have restricted her in any way from working.  (A.R. 65.)

In his September 23, 2002 decision, the ALJ found that Plaintiff has not engaged in substantial gainful activity since February 1, 2001. (A.R. 18.)   The ALJ found that Plaintiff was a "younger" individual during the alleged period of disability (February 1, 2001 to February 1, 2002), has a high school education, and had completed some college classes.   (A.R. 19-20.)   He found that Plaintiff had "severe" impairments of hypertension, alcohol abuse, and depression during the claimed period of disability.   (A.R. 18-19.)   The ALJ found that Plaintiff's impairments were equivalent to Listings 12.04 and 12.09, 20 C.F.R. Pt. 404, Appendix 1 to Subpt. P, during the claimed period of

---

[4]    "Medium work" involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. §§ 404.1567(c), 416.967(c).

6

disability, and further explained:[5]

_____

[5]    Listing 12.04 for Affective Disorders provides:

[Affective Disorders are] [c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. [¶] The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
    A. Medically documented persistence, either continuous or intermittent, of one of the following:
    1. Depressive syndrome characterized by at least four of the following:
    a. Anhedonia or pervasive loss of interest in almost all activities; or
    b. Appetite disturbance with change in weight; or
    c. Sleep disturbance; or
    d. Psychomotor agitation or retardation; or
    e. Decreased energy; or
    f. Feelings of guilt or worthlessness; or
    g. Difficulty concentrating or thinking; or
    h. Thoughts of suicide; or
    i. Hallucinations, delusions or paranoid thinking; or
    2. Manic syndrome characterized by at least three of the following:
    a. Hyperactivity; or
    b. Pressure of speech; or
    c. Flight of ideas; or d. Inflated self-esteem; or
    e. Decreased need for sleep; or
    f. Easy distractibility; or
    g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
    h. Hallucinations, delusions or paranoid thinking;

or

    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

    B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration;

7

Regarding the "B" criteria of Listing 12.04, with alcohol use [Plaintiff] was mildly to moderately limited in her ability to perform activities of daily living. [Plaintiff] was moderately limited in her ability to maintain social functioning. She had mild to moderate difficulty maintaining concentration, persistence, and pace. [Plaintiff] did not experience repeated episodes of decompensation of extended duration.

The "C" criteria of Listing 12.04 were not satisfied.

---

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.09 for Substance Addiction Disorders provides:

[Substance Addiction Disorders are] [b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied.
A. Organic mental disorders. Evaluate under 12.02.
B. Depressive syndrome. Evaluate under 12.04.
C. Anxiety disorders. Evaluate under 12.06.
D. Personality disorders. Evaluate under 12.08.
E. Peripheral neuropathies. Evaluate under 11.14.
F. Liver damage. Evaluate under 5.05.
G. Gastritis. Evaluate under 5.04.
H. Pancreatitis. Evaluate under 5.08.
I. Seizures. Evaluate under 11.02 or 11.03.

8

(A.R. 19.)


The ALJ found that, although Plaintiff was "disabled" within the meaning of the Social Security Act for the period covering February 1, 2001, to February 1, 2002, substance abuse was "a contributing factor material to the finding of disability." (A.R. 19.)  In rendering this finding, the ALJ further explained that, if Plaintiff had not used alcohol during that period, her condition would not have met or equaled the requirements of Listings 12.04 and 12.09.  (*Id*.)  The ALJ also explained that, "[w]ere it not for alcohol abuse, [Plaintiff] would have had no mental limitations."  (A.R. 16.)  He found that, absent the alcohol use, Plaintiff would have had the residual functional capacity to lift and carry up to 25 pounds frequently and 50 pounds occasionally, and could sit, stand, and walk for six hours in an eight-hour day. (A.R. 19.)  In addition, the ALJ found that Plaintiff was unable to perform her past relevant work during the claimed period of disability, but could have been capable of performing other jobs in the national economy, again, absent her substance abuse.  (A.R. 19-20.)  The ALJ found Plaintiff's allegations regarding her symptoms and limitations to be not credible.  (A.R. 19.)  Accordingly, the ALJ concluded that Plaintiff was not entitled to SSI.  (A.R. 20.)


**STANDARD OF REVIEW**


This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).  The Commissioner's decision must stand if it is supported by substantial

1  evidence and applies the appropriate legal standards.  <u>Saelee v. Chater</u>,

2  94 F.3d 520, 521 (9th Cir. 1996).  Substantial evidence is "more than a

3  mere scintilla but less than a preponderance -- it is such relevant

4  evidence that a reasonable mind might accept as adequate to support the

5  conclusion."  <u>Moncada v. Chater</u>, 60 F.3d 521, 523 (9th Cir. 1995).

6

7      Although this Court cannot substitute its discretion for that of

8  the Commissioner, this Court nonetheless must review the record as a

9  whole, "weighing both the evidence that supports and the evidence that

10 detracts from the [Commissioner's] conclusion."  <u>Desrosiers v. Secretary</u>

11 <u>of Health and Human Serv.</u>, 846 F.2d 573, 576 (9th Cir. 1988); <i>see also</i>

12 <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).  "The ALJ is

13 responsible for determining credibility, resolving conflicts in medical

14 testimony, and for resolving ambiguities."  <u>Andrews v. Shalala</u>, 53 F.3d

15 1035, 1039-40 (9th Cir. 1995).  This Court must uphold the

16 Commissioner's decision if it is supported by substantial evidence and

17 free from legal error, even when the record reasonably supports more

18 than one rational interpretation of the evidence.  <i>Id.</i> at 1041; <i>see also</i>

19 <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d

20 595, 599 (9th Cir. 1999); <u>Flaten v. Secretary</u>, 44 F.3d 1453, 1457 (9th

21 Cir. 1995).

22

23                              **DISCUSSION**

24

25      Plaintiff alleges four disputed issues.  <u>First</u>, Plaintiff contends

26 that the June 27, 2002 opinion of Dr. Galen demonstrates that her

27 depression continued during her claimed period of disability, even after

28 she stopped using alcohol, and that the ALJ improperly rejected this

                                    10

opinion in finding that Plaintiff was not disabled due to her substance abuse. (Joint Stip. at 3-5.) <u>Second</u>, Plaintiff contends that the ALJ erred in evaluating Plaintiff's impairments of hypertension, heart problems, glaucoma, asthma, and borderline intellectual functioning. (*Id.* at 6-7.) <u>Third</u>, Plaintiff contends that the ALJ failed to set forth proper reasons for discrediting Plaintiff's claimed symptoms and limitations and the statements made by her son, Victor Boykins. (*Id.* at 8-11.) <u>Fourth</u>, Plaintiff contends that the ALJ erred in failing to elicit testimony from the vocational expert and to provide the names of jobs that Plaintiff could perform. (*Id.* at 12-13.)

**A.   <u>The ALJ Properly Found That Plaintiff's Substance Abuse Was A Contributing Factor Material To Her Disabling Depression</u>.**

Ordinarily, the opinions of a treating physician should be given great weight, if not controlling weight. *See* <u>Magallanes v. Brown</u>, 881 F.2d 747, 751 (9th Cir. 1989)(quoting <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1230 (9th Cir. 1987)); Social Security Ruling 96-2p. When the ALJ rejects the opinion of a treating physician, even if it is contradicted, the ALJ may reject that opinion only by providing specific and legitimate reasons for doing so, supported by substantial evidence in the record. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ may reject the opinion of either a treating or examining physician if that opinion is conclusory, brief and unsupported by clinical findings. <u>Matney v. Sullivan</u>, 981 F.2d 1016, 1019 (9th Cir. 1992).

The ALJ's written decision shows that he considered the June 27, 2002 letter of Dr. Galen, Plaintiff's treating physician, in which Dr.

11

Galen stated that Plaintiff's depression was not secondary to alcohol use. (A.R. 15, citing Exh. 9F/1 (A.R. 314).) However, in reaching his conclusions as to Plaintiff's mental residual functional capacity, the ALJ ultimately relied upon the opinion of Dr. Iger, the non-examining medical expert, who found that Plaintiff's alcohol use was the reason that Plaintiff was "disabled" under Listings 12.04 and 12.09 during the period from February 1, 2001, to February 1, 2002, stating:

> The Administrative Law Judge has carefully reviewed all the medical evidence of record and concurs with the opinions of the Medical Experts. Accordingly, based on the testimony of Dr. Iger, the Administrative Law Judge finds that [Plaintiff] was under a disability during the period February 1, 2001 to February 1, 2002. However, [I] also conclude[] that substance abuse was a contributing factor material to the finding of disability. Were it not for alcohol abuse, [Plaintiff] would have had no mental limitations.

(A.R. 16.)

In testifying about the effects of Plaintiff's alcohol abuse at the June 20, 2002 hearing, Dr. Iger explained:

> Q: In your opinion, was [Plaintiff's] alcohol use a contributing, material factor to her impairment?
>
> A. Yes.

12

Q: If her alcohol was removed, would her condition have improved?

A: Yes.

Q: How would it have improved, in your opinion?

A: Alcohol is a depressant.

Q: If the alcohol use was removed, would her functional limitations have been less?

A: Yes.

(A.R. 45-46.)

After Dr. Galen's June 27, 2002 letter was added to the record, Dr. Iger further testified about the effects of Plaintiff's alcohol use on her depression at the September 9, 2002 hearing and addressed Dr. Galen's June 27, 2002 letter, as follows:

Q: . . . I think . . . [Dr. Galen's] position is that the depression was not secondary to her alcohol use and continued until she started her medication.  Now, . . . I would like your opinion as to what you think at this point, happened.

A: Well, I have to go back to [Dr. Galen's 2001 report].  It says she has had a substance abuse problem, including use of

13

cocaine, marijuana and alcohol.  She states that she drinks,
in the present tense, two to three times a week.  When she
drinks, she will drink a half a pint of gin.  She's been doing
this for the past three years.  She has not used cocaine or
marijuana over [a] year.  She used to binge on cocaine over
the weekends.

.    .    .    .

I go to the last line of [Dr. Galen's June 27, 2002 letter],
[which states that] her symptoms of depression improved when
she began taking antidepressant medication.     Absent the
alcohol, the medication now has a chance to really grab hold
because alcohol, as [Plaintiff] knows, is a depressant in and
by itself so it makes you depressed by itself and then if
you're adding an antidepressant on it, [it is] . . . getting
no [effect].   So, now you're getting the [effect] of the
antidepressants.

.    .    .    .

[When] I'm looking at Dr. Galen's report[,] . . . it just
looks to me like he was just writing something that he might
have been asked to write, if it's primary or secondary. . . .
[There is] an underlying depression but it is not severe and
it is amenable to treatment and . . . I think with the therapy
group. . . .   There's still an underlying depression but I
believe that she could certainly work with this underlying

14

depression.  It is not going to restrict her severely.

(A.R. 60-65.)

Plaintiff contends that the ALJ improperly rejected Dr. Galen's opinion in rendering his finding as to Plaintiff's claimed depression. (Joint Stip. at 3-5.)  Specifically, Plaintiff maintains that the ALJ improperly rejected the opinion in Dr. Galen's June 27, 2002 letter showing that "[her] alcohol use was not the cause of her depression." (*Id.* at 3.)  Plaintiff further contends that the ALJ's finding that she had no disabling depression in the absence of her substance abuse therefore is in error.  (*Id.* at 4-5.)

Under the Social Security Regulations, a claimant is not eligible to receive disability benefits if drug or alcohol addiction is a "contributing factor material to a determination of disability."  20 C.F.R. §§ 404.1535, 416.935.  The "'key factor . . . in determining whether alcoholism or drug addiction is a contributing factor material to the determination of a disability'" is "whether an individual would still be found disabled if she stopped using alcohol or drugs." <u>Sousa v. Callahan</u>, 143 F.3d 1240, 1245 (9th Cir. 1998)(citing 20 C.F.R. § 404.1535(b)(1)).

Thus, a two-step analysis is required.  <u>First</u>, the ALJ must evaluate which of the claimant's physical and mental limitations would remain if the claimant refrained from drug and alcohol use.  <u>Second</u>, the ALJ must determine whether the claimant's remaining limitations would be disabling.  20 C.F.R. §§ 404.1535(b), 416.935(b).  However, it is not

proper to simply conclude that substance abuse is a contributing factor to the mental impairment without distinguishing between the substance abuse contributing to the disability and the disability remaining if the Plaintiff stopped using drugs or alcohol.  <u>Sousa</u>, 143 F.3d at 1245 (reversing and remanding case for the ALJ to determine whether claimant's disability would have continued if she stopped using drugs and alcohol); <u>Bustamante v. Massanari</u>, 262 F.3d 949, 955 (9th Cir. 2001)(ALJ improperly concluded that claimant's mental problems were the consequence of his alcohol abuse without attempting to determine the impact of his alcoholism on his other mental impairments).

Here, the ALJ properly complied with the legal standards in finding that Plaintiff's substance abuse was a contributing factor material to her disabling depression during the claimed period of disability.  Dr. Iger's explanation -- that regardless of whether Plaintiff's depression was "primary" or "secondary" to her substance abuse, alcohol is a depressant and precludes anti-depressant medication from taking effect -- provides a reasonable basis for her opinion that Plaintiff would not have suffered from disabling depression in the absence of her alcohol abuse during the relevant time period.  Dr. Iger further cogently explained that Plaintiff's depression was responsive to therapy and medication and, in the absence of substance abuse, Plaintiff's underlying depression would not have severely restricted her functioning in the workplace.

Moreover, Dr. Iger's opinion of Plaintiff's mental residual functional capacity and her interpretation of Dr. Galen's June 27, 2002 letter at the September 9, 2002 hearing are <u>not</u> inconsistent with or a

1   "rejection" of Dr. Galen's opinion, as Plaintiff contends.  Plaintiff

2   contends that Dr. Galen's June 27, 2002 letter demonstrates that Dr.

3   Iger's conclusions are in error, because it shows that "[P]laintiff's

4   alcohol use was not the cause of her depression."  (Joint Stip. at 3.)

5   However, Dr. Galen did not state that Plaintiff's continuing depression

6   after she stopped abusing alcohol would have precluded her from working

7   or limited her in any way.   Instead, Dr. Galen merely stated that

8   Plaintiff's "symptoms of depression improved after [Plaintiff] began

9   taking her anti-depressant medication."  (A.R. 314.)

10

11       Thus, the ALJ properly relied upon the testimony of Dr. Iger in

12   reaching his ultimate finding that Plaintiff's remaining depression, in

13   the absence of her substance abuse, would not have resulted in any

14   limitations impacting her ability to work, as Dr. Iger's conclusions are

15   consistent with and supported by the record.  Jamerson v. Chater, 112

16   F.3d 1064, 1067 (9th Cir. 1997)(ALJ properly relied upon the reports of

17   two non-examining advisors who both reviewed the available records and

18   completed individualized assessments reaching the same conclusion);

19   Andrews, 53 F.3d at 1041("[R]eports of the nonexamining advisor need not

20   be discounted and may serve as substantial evidence when they are

21   supported by other evidence in the record and are consistent with it").

22   Accordingly, the Court does not disturb this finding.

23

24   **B.**   **The ALJ Should Further Develop The Record Regarding Plaintiff's**

25       **Hypertension, Vision, And Cardiac Problems, But Need Not Further**

26       **Examine Her Asthma And Borderline Intellectual Functioning.**

27

28       "The RFC assessment considers only functional limitations and

                                    17

restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."   Social Security Ruling 96-8p.   According to 20 C.F.R. §§ 404.1545(a) and 416.945(a):

> Residual functional capacity is an assessment based upon **all** of the relevant evidence. . . .   Observations by your treating or examining physicians or psychologists, your family, neighbors, friends, or other persons, of your limitations, in addition to those observations usually made during formal medical examinations, may also be used.   These descriptions and observations, when used, must be considered along with your medical records to enable us to decide to what extent your impairment(s) keeps you from performing particular types of work you may be able to do despite your impairment(s).

(Emphasis added.)   "We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s)."   20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).

Plaintiff contends that the ALJ improperly failed to find that she had more severe limitations arising from her hypertension and failed to evaluate the limitations arising from her other physical impairments, *viz.*, heart problems, glaucoma, asthma, and borderline intellectual functioning, in rendering his physical residual functional capacity finding.   (Joint Stip. at 6-7.)

18

In reaching his conclusion regarding Plaintiff's physical residual functional capacity, the ALJ relied upon the opinion of Dr. Nafoosi, the non-examining medical expert, who found that Plaintiff had no limitations based on her hypertension, because Plaintiff had "never been hospitalized for [her hypertension]" and has no "end organ damage."[6] (A.R. 16, 57-58.)   With respect to Plaintiff's heart problems, Dr. Nafoosi merely noted that an electrocardiogram was "abnormal" and showed old myocardial infarction, but it did not show evidence of ventricular hypertrophy and Plaintiff had not been hospitalized for her heart problems.   (A.R. 57.)   In describing her physical residual functional capacity, Dr. Nafoosi opined that Plaintiff was limited to "medium" work, but "there would be no other restrictions."   (A.R. 58.)

However, the records from Plaintiff's treating doctors indicate that Plaintiff's hypertension may have caused vision problems and glaucoma.   Significantly, they show that Plaintiff's hypertension has been a major health problem since the 1980's and, at one point, was described as "out of control."   (*See* A.R. 267 -- February 10, 1988

---

[6]   Specifically, in describing the records upon which he relied in formulating his opinion as to Plaintiff's physical residual functional capacity, Dr. Nafoosi testified, as follows:

> The file was reviewed and the medically-determinable condition elicited was that of hypertension.   That was in 2-F.   She has a number of other complaints that were not documented by objective medical findings such as chest pain or palpitations. There was also a working diagnosis of dysfunctional uterine bleeding as well.   The hypertension, the file shows that she's never been hospitalized for it.   She's not had a chest X-ray in the file.   The EKG was abnormal but did not show evidence of ventricular hypertrophy.   The reading was possible, old myocardial infarction but she's never been hospitalized for that.   So, in summary, the patient has hypertension without end organ damage.

(A.R. 57.)

treatment notes.)  Plaintiff has consistently taken medication for her hypertension.  (See A.R. 171, 260-61.)  In addition, consistent with Plaintiff's allegations of blurred vision in her application papers, the notes of Plaintiff's treating doctors from the 1980's show that she had reported dizziness and blurred vision and, while this is not entirely clear, indicate that these symptoms may have been attributable to her hypertension.  (See A.R. 264, 267.)  In September 2000, Plaintiff was referred to an ophthalmologist for her vision problems, and was diagnosed with "rule out glaucoma."[7]  (A.R. 171.)

Although Dr. Nafoosi indicated that he reviewed the medical record (A.R. 57), this Court nevertheless cannot confirm whether his opinion that Plaintiff had no limitations arising from her hypertension during the relevant time period is based on substantial evidence.  Dr. Nafoosi's explanation of his conclusion -- that Plaintiff had no limitations flowing from her hypertension because there was no "end organ damage" and Plaintiff had not been hospitalized for any problems related to her hypertension -- fails to provide any reasons for his rejection of the symptoms, such as dizziness and blurred vision noted in the above-described records, indicating that Plaintiff did, in fact, have symptoms potentially related to her hypertension which could bear

---

[7]     Although Plaintiff was diagnosed with rule out glaucoma, objective testing indicates that her visual acuity is only slightly affected.  (See A.R. 182 -- April 6, 2001 visual acuity test showing that Plaintiff had 20/50 vision in both eyes without glasses.)  However, to the extent that it may be possible that Plaintiff had vision problems that did not affect her visual acuity or that she had vision problems which did affect her visual acuity on a constant basis, and given Dr. Nafoosi's failure to explain or discuss the records indicating Plaintiff's vision problems, the Court cannot determine whether the present residual functional capacity finding is based on substantial evidence.

upon her residual functional capacity.  Indeed, he failed to discuss the records diagnosing Plaintiff with rule out glaucoma whatsoever.  Thus, it is unclear whether his conclusion is consistent with and supported by the record.  <u>Jamerson</u>, *supra*, 112 F.3d at 1067; <u>Andrews</u>, *supra*, 53 F.3d at 1041.

To the extent that the records regarding Plaintiff's hypertension are unclear, the record should be further developed and clarified so that Plaintiff's limitations can be assessed properly.  *See* <u>Brown v. Heckler</u>, 713 F.2d 441, 442-43 (9th Cir. 1993)(Commissioner has an affirmative duty to develop the record, even if the claimant is represented by counsel); 20 C.F.R. §§ 404.1512(e), 416.912(e)(duty to re-contact treating physician); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 956-57, 959 (9th Cir. 2002)(requirement in 20 C.F.R. §§ 404.1512(e), 416.912(e) that the Commissioner re-contact treating sources is triggered where the information from the treating sources is inadequate to make a determination regarding disability); *see also* 20 C.F.R. §§ 404.1519a(b), 416.919a(b)(listing situations requiring a consultative examination, such as a conflict, inconsistency, ambiguity or insufficiency in the evidence).

Furthermore, the record contains evidence suggesting that Plaintiff had more severe heart problems during the relevant time period than Dr. Nafoosi accounted for in his opinion, and note that Plaintiff experienced related symptoms, such as chest pains, fatigue, and heart palpitations.  (A.R. 174, 177, 271.)  It is significant that Dr. Chan, an examining physician, noted in his April 6, 2001 report that:  "chest pain [is a concern] for possible angina and coronary artery disease

given the multiple cardiac risk factors for this patient, including being postmenopausal, having hypertension, and being a smoker as well as a positive family history." (A.R. 177.)  Dr. Chan explained that, before he could assess Plaintiff's limitations, he would need to obtain and review results from an electrocardiogram and treadmill test. (*Id.*) Although the record contains an October 3, 1984 electrocardiogram and a January 1, 1988 electrocardiogram, which shows evidence of a "possible old" myocardial infarction, updated tests apparently were never obtained. (A.R. 58-59, 180, 289.)

   Given the evidence regarding Plaintiff's cardiac problems, including Plaintiff's January 1, 1988 electrocardiogram indicating a possible old myocardial infarction, as well as Dr. Chan's conclusion that electrocardiogram and treadmill tests were necessary to assess Plaintiff's physical limitations, the record should be further developed and clarified.  Specifically, the ALJ should order updated testing to confirm the extent of Plaintiff's cardiac problems.[8]  *See* 20 C.F.R. § 404.1517 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests."); 20 C.F.R. §§ 404.1519f, 416.919f (provides for the purchase of a special test, including electrocardiograms); 20 C.F.R. §§ 404.1519k, 416.919k ("We may purchase x-rays and laboratory tests, including . . . electrocardiograms").

---

   [8]   While the ALJ noted at the September 9, 2002 hearing that he was hoping to receive an assessment from a "civilian provider" after Plaintiff had received a further electrocardiogram and stress test, no such tests were ever obtained.  The ALJ erroneously stated that the Commissioner will not provide for Plaintiff to obtain an electrocardiogram or stress test. (A.R. 59.)

After such testing, the ALJ should seek an opinion from a qualified medical professional to determine what limitations, if any, result from Plaintiff's hypertension and cardiac problems during the period in question. *See* 20 C.F.R. §§ 404.1513(a)(1), 416.913(a)(1)(a decision regarding a claimant's medically determinable impairments should be based upon a determination made by an "acceptable medical source," such as a licensed physician).

However, Plaintiff's remaining arguments that the ALJ failed to take into consideration limitations resulting from her asthma and borderline intellectual functioning are unavailing. Plaintiff never raised these conditions as a basis of her disability. *See* Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999)(claimants must raise issues at their administrative hearings in order to preserve them on appeal to a district court). Moreover, the 20-year span of records submitted Plaintiff's treating physicians show little reference to Plaintiff's asthma. (*See* A.R. 257 -- brief mention of asthma in May 12, 1997 progress notes; *cf.* A.R. 176-78 -- Dr. Chan's April 6, 2001 report showing good air movement and clear breath sounds in Plaintiff's lungs.) While Dr. Andonov found in his April 17, 2001 report that Plaintiff's intellectual functioning was "borderline" (A.R. 187), this test was performed during a time that Plaintiff had reported that she was abusing substances. (*See* A.R. 233 -- Plaintiff noted to Dr. Galen on August 8, 2001 that "she drinks 2-3 times per week" and believes that "she is drinking too much and she needs to cut back.") Furthermore, the record contains no evidence to corroborate Plaintiff's claim that she suffers from retardation or low intellectual functioning. Indeed, Plaintiff has completed high school and some college, and she was able to adequately

fill out her application papers.

Accordingly, the ALJ should further develop and clarify the record with respect to Plaintiff's hypertension and cardiac problems in order to ensure that all limitations arising from such conditions are adequately incorporated into the ALJ's physical residual functional capacity finding, but the ALJ need not consider further limitations arising from Plaintiff's claimed asthma and borderline intellectual functioning.

**C.   The ALJ Improperly Disregarded Statements Regarding Plaintiff's Claimed Symptoms And Limitations.**

The law is well-settled that, once a disability claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to cause some level of pain of the type which the claimant alleges, the claimant's subjective complaints regarding the severity of his or her pain may not be discredited based solely on a lack of objective medical evidence to corroborate the allegations. Tonapetyan v. Halter, 242 F.3d 1144, 1147-48 (9th Cir. 2001); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1985). As the Ninth Circuit has explained:

> [A]n ALJ's finding that a claimant generally lacked credibility is a permissible basis to reject excess pain testimony. But, because a claimant need not present clinical or diagnostic evidence to support the severity of his pain, *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990)

24

(stating that "it is the very nature of excess pain to be out of proportion to the medical evidence"), a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain.

Light v. Social Security Admin., 119 F.3d 789, 792 (9th Cir. 1997). This rule is based on the recognition that pain is an inherently subjective phenomenon, which cannot be objectively verified or measured and varies significantly among individuals. Bunnell, 947 F.2d at 347.

Unless the evidence suggests affirmatively that a claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's excess pain or symptom testimony, such as conflicts between the claimant's testimony and conduct, or internal contradictions in the claimant's testimony. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Light, 119 F.3d at 792.   In determining whether a claimant's testimony regarding the severity of his symptoms is credible, the ALJ may consider:  "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." Smolen, 80 F.3d at 1284.

The Court will give great weight to the ALJ's credibility assessment. Anderson v. Sullivan, 914 F.2d 1121, 1124 (9th Cir. 1990); Brawner v. Secretary, 839 F.2d 432, 433 (9th Cir. 1988)(recognizing that

1   the ALJ's credibility determination is to be given great weight when
2   supported specifically).   However, when an ALJ's decision rests on a
3   negative credibility evaluation, "the ALJ must make findings on the
4   record and must support those findings by pointing to substantial
5   evidence on the record." Cequerra v. Secretary, 933 F.2d 735, 738 (9th
6   Cir. 1991); Oreteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995)(the
7   ALJ's findings must be "sufficiently specific to permit the reviewing
8   court to conclude that the ALJ did not arbitrarily discredit the
9   claimant's testimony.")  When discrediting a claimant's testimony, it is
10  not enough for the ALJ to make only general findings; he must state
11  which pain testimony is not credible and what evidence suggests that the
12  complaints are not credible.  See Swenson v. Sullivan, 876 F.2d 683, 688
13  (9th Cir. 1979).

14

15      In rejecting Plaintiff's subjective pain testimony, the ALJ stated:

16

17          Considering [the factors to be considered in addition to the
18          objective medical evidence when assessing the credibility of
19          an individual's statements], the Administrative Law Judge
20          finds that [Plaintiff's] complaints credibly establish no less
21          of a residual functional capacity than described above.
22          [Plaintiff] appeared to function well during the alleged
23          period of disability.  In a Daily Activities Questionnaire
24          dated March 5, 2001, [Plaintiff] reported that she washed
25          dishes, cooked, shopped for groceries on a monthly basis, and
26          visited with others.  (Exhibit 4E).  Also, [Plaintiff's]
27          earnings record reflects no wages or only de minimis earnings
28          in all but a few years since 1972.  (Exhibit 2D).  This

26

suggests that [Plaintiff] may not be particularly motivated to work.

(A.R. 17.)

Plaintiff argues that the ALJ's credibility finding does not "satisfy the law," and that her statements indicate greater limitations than the medical evidence alone. (Joint Stip. at 8-9.) Plaintiff further contends that the ALJ improperly rejected, without comment, the statements made by Mr. Boykins, her son, regarding her limited daily activities. (Joint Stip. at 10-11.)

In her application papers, Plaintiff complained of heart palpitations, dizziness, blurred vision, and fatigue. (*See* A.R. 122, 145.) In her March 5, 2001 Daily Activities Questionnaire, Plaintiff noted that: she does household chores, such as washing dishes, cooking, and reading, and her son helps her with the cooking; she cooks once a day, mostly baked chicken, pork chops, rice and potatoes; she shops once a month and her son helps her with the shopping by pushing the cart and carrying the groceries; she plays chess, dominoes, and watches old movies; she reads the newspaper and magazines; she does not drive; she leaves her home once a week to see other relatives, go to the grocery store, or go to her doctor appointments; her son helps her with the cleaning; she has night sweats and wakes frequently; and she worries "a lot" and gets tired easily. (A.R. 141-45.)

As noted above, the medical evidence of record establishes that Plaintiff had medically determinable physical impairments during the

claimed period of disability which would reasonably be expected to have produced symptoms and functional limitations, *to wit*, hypertension and cardiac problems.  In addition, the record contains objective evidence supporting these impairments, and the ALJ did not find that Plaintiff was malingering.  (*See, e.g.*, A.R. 180 -- January 1, 1988 electrocardiogram; A.R. 267 -- March 12, 1988 progress notes from San Bernardino County Medical Center noting Plaintiff's prescription for Tenormin and noting "hypertension out of control"; A.R. 273 -- November 26, 1997 blood test report noting "wbc toxicity"; A.R. 261 -- clinical notes dated November 1, 1994 showing that Plaintiff was taking Procardia for her hypertension; A.R. 171 -- Dr. Andre Blaylock's September 1, 2000 notes diagnosing Plaintiff with "rule out glaucoma"; A.R. 256 -- October 27, 2000 notes from the Arrowhead Regional Medical Center noting "glaucoma suspect[ed].")   Thus, given the objective evidence of Plaintiff's impairments and the absence of a suggestion of malingering, the ALJ was required to provide clear and convincing reasons for rejecting her claimed symptoms and limitations.

Here, it is possible that Plaintiff's claimed dizziness, blurred vision, and fatigue could flow from her medically-determinable impairments.  However, the ALJ did not question Plaintiff regarding these complaints at the hearing, and simply dismissed them all without distinguishing among them.

It is true that Plaintiff's lack of employment since 1972, long before she applied for disability benefits, does provide some basis for the ALJ's finding that Plaintiff's claimed limitations are not credible.  *See* Thomas, 278 F.3d at 959 (affirming the ALJ's credibility rejection

28

based on the claimant's "extremely poor work history" and lack of "propensity to work in her lifetime"). Nevertheless, it was improper for the ALJ to fail to delineate among Plaintiff's subjective complaints and, instead, to reject all of them on these same, general grounds -- that Plaintiff performed various daily activities and had no significant work history. *See* Swenson, 876 F.2d at 688. While the ALJ may consider Plaintiff's daily activities and work history in assessing her credibility, he failed to point to specific evidence in the record undermining each claimed symptom or limitation. *See* Smolen, 80 F.3d at 1283-84 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); Lester, 81 F.3d at 834 (ALJ "must state specifically what [symptom] testimony is not credible and what evidence undermines the claimant's complaints").

Most importantly, the other rationale in the ALJ's broad rejection -- that Plaintiff's ability to engage in these various and general daily activities shows that her allegations regarding her symptoms and limitations lack credibility -- is flawed, because the ALJ does not explain how the ability to perform any of these non-work-related activities reasonably translates to the ability to perform job functions on a continuous basis for a 40-hour work week. *See* Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990)(daily activities may not be relied upon to support an adverse credibility decision where those activities do not affect the claimant's ability to perform appropriate work activities on an ongoing and daily basis); Smolen, 80 F.3d at 1283 n.7 ("many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take

medication.").   In addition, the clarification and development of the record on remand pertaining to Plaintiff's hypertension and cardiac problems could shed more light on and further bolster the support for Plaintiff's claimed symptoms of blurred vision, dizziness, and fatigue.

Accordingly, on remand, the ALJ should reconsider his findings regarding Plaintiff's claimed symptoms and limitations, and he must provide reasons, if they exist, for discrediting them that are "clear and convincing" in accordance with the requisite legal standard.

With respect to Plaintiff's argument that the ALJ improperly ignored statements made by her son pertaining to her symptoms and limitations, the record shows that Mr. Boykins, who lives with his mother, stated in a March 5, 2001 Daily Activities Questionnaire that: Plaintiff sometimes has night sweats and difficulties sleeping; he "[helps] her with the cleaning [because] she tires quickly and has difficulty breathing"; she "at times needs help combing her hair and clipping her toenails"; he "[helps] her prepare her meals mostly all the time"; he "[helps] her with the grocery shopping [by] pushing the cart and carrying the grocery bags"; he helps her with her bill-paying; he helps her with the laundry and cleaning; he accompanies her when she goes out because she does not like to go alone and she "rarely goes anywhere"; "she has a license, [but] does not drive a car"; her hobbies are watching movies, talk shows, and soaps, and playing dominoes; and "she constantly worries."   (A.R. 135-39.)   Mr. Boykins further noted that her vision is getting worse, because he has to read to her "sometimes."   (A.R. 140.)

As this case is being remanded so that the ALJ can develop the record regarding Plaintiff's physical residual functional capacity and remedy his credibility finding regarding Plaintiff's claimed symptoms and limitations, and Mr. Boykins's written statements are relatively brief and relevant to Plaintiff's residual functional capacity (*see* A.R. 135-40), the Court further directs the ALJ to reconsider the statements made by Mr. Boykins in his March 5, 2001 Daily Activities Questionnaire on remand of this case.

**D.**   **The ALJ May Need To Seek Testimony From A Vocational Expert On Remand.**

As discussed above, the ALJ must reconsider his findings regarding Plaintiff's physical residual functional capacity and Plaintiff's claimed symptoms and limitations. Although the Court therefore need not reach Plaintiff's contention that the ALJ erred by failing to consider the combined effects of Plaintiff's impairments (Joint Stip. at 7), the ALJ is directed to consider the combined effects of her impairments on remand. Even if any one of these impairments does not meet the criteria specified in the listings, the ALJ must find that Plaintiff is disabled if the combination of Plaintiff's impairments is medically equal to any listed impairment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d); <u>Lewis v. Apfel</u>, 236 F.3d 503, 514 (9th Cir. 2001).

Although Plaintiff further contends that the ALJ erred by not eliciting testimony from a vocational expert and by not identifying the specific jobs that Plaintiff could perform (Joint Stip. at 12-13), the Court need not reach these issues, as well, in view of the fact that the

finding regarding Plaintiff's residual functional capacity must be reassessed.   Nevertheless, to the extent that the ALJ's residual functional capacity finding includes non-exertional limitations, the ALJ must elicit testimony from a vocational expert.   Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001)(where a claimant suffers only from exertional limitations, but not non-exertional limitations, the ALJ at step five may apply the grids to match the claimant with appropriate work); Reddick v. Chater, 157 F.3d 715, 729 (9th Cir. 1998); Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)(same); Reddick, 157 F.3d at 729 (emphasis added)(ALJ "may apply the grids in lieu of taking testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations," but not in cases where the grids do not accurately account for a claimant's limitations).   If a vocational expert's testimony is not based on a claimant's complete set of limitations, then it has no evidentiary value. See Embrey v. Bowen, 849 F.2d 418, 422-24 (9th Cir. 1987)(In posing a hypothetical to a vocational expert, the ALJ must fully and accurately reflect all of the claimant's limitations).

**E.   <u>Remand Is Required</u>.**

Because there is error in the ALJ's findings and the record requires further development, as discussed above, remand is appropriate to allow the ALJ the opportunity to remedy such errors and inadequacies. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000)(when there are outstanding issues that must be resolved before the question of disability can be determined, remand is appropriate); McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989)(remand appropriate to remedy

defects in the record).

**CONCLUSION**

Accordingly, for the reasons stated above, the Commissioner's decision is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order. Judgment shall be entered reversing the decision of the Commissioner, and remanding the matter for further administrative action consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and for Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 30, 2006.

_____
                          /s/
                    MARGARET A. NAGLE
            UNITED STATES MAGISTRATE JUDGE

33